UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALEJANDRA DELAROSA
on behalf of V.M.D., a minor,

        Plaintiff,                Civil Action No. 13-10037

      v.                     District Judge Nancy G. Edmunds
                               Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [16] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17]**

Plaintiff Alejandra Delarosa on behalf of her son V.M.D., a minor, appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his application for supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 16, 17). For the reasons set forth below, this Court finds that the decision of the Administrative Law Judge is not supported by substantial evidence, and that new and material evidence requires remand. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 16) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 17) be DENIED, and that,

1

pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. PROCEDURAL HISTORY

On November 30, 2009, Delarosa applied for supplemental security income ("SSI") on behalf of her son V.M.D., asserting a disability onset date of January 1, 2008. (Tr. 118.) V.M.D. was 18 months old on the onset date. (*See* Tr. 118.)

The Commissioner initially denied the application on June 28, 2010. (Tr. 65.) Delarosa requested an administrative hearing, and on August 26, 2011, she and V.M.D. appeared with counsel before Administrative Law Judge Oksana Xenos, who considered V.M.D.'s case *de novo*. (Tr. 47–63.) In an October 14, 2011 decision, the ALJ found that V.M.D. was not disabled within the meaning of the Social Security Act. (Tr. 42.) The ALJ's decision became the final decision of the Commissioner on November 5, 2012, when the Social Security Administration's Appeals Council denied Delarosa's request for review. (Tr. 1.) Delarosa filed this suit on January 4, 2013. (Dkt. 1, Compl.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). A child under age 18 is considered disabled within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). The Social Security regulations set forth a sequential three-step process for determining children's disability claims: first, the child must not be engaged in substantial gainful activity; second, the child must have a severe impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. § 416.924.

To meet a listed impairment, a child must demonstrate both "A" and "B" criteria of the impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* To be found disabled by meeting a listed impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment(s) do not meet a listed impairment, the impairment(s) may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. §§ 416.926, 416.926a; *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003) ("Medical equivalency is covered by 20 C.F.R. § 416.926; functional equivalency is covered by Section 416.926a."). "To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged

3

impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, No. 1:08CV254, 2009 WL 1741375, at *8 (S.D. Ohio June 18, 2009) (citing 20 C.F.R. § 416.926(a)).  A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;
>
> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or
>
> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Koepp v. Astrue*, No. 10-C-1002, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011) (citing 20 C.F.R. § 404.1526(b)); *see also* 20 C.F.R. § 416.926. "The essence of these subsections is that strict conformity with the Listing Requirements is not necessarily required for a finding of disability." *Emeonye v. Astrue*, No. 04-03386, 2008 WL 1990822, at *4 (N.D. Cal. May 5, 2008). Thus, "[i]f a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance." *Id.*

4

To determine functional equivalence, an ALJ is to evaluate six domains of functioning: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a. Functional equivalence to a listed impairment exists when the child has an extreme limitation in one domain or marked limitations in two of the six domains. *See* 20 C.F.R. § 416.926a(d). A marked limitation results if the child's impairment(s) seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An extreme limitation exists when a child's impairment(s) very seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

ALJ Xenos applied this framework to V.M.D.'s SSI application as follows. At step one, she found that V.M.D. had not engaged in substantial gainful activity since November 30, 2009, the application date. (Tr. 27.) At step two, she found that V.M.D. had the following severe impairments: pervasive developmental disorder and adjustment disorder. (*Id.*) She found the following impairments non-severe: asthma, obesity, and seizure disorder. (*Id.*) At step three, the ALJ concluded that V.M.D. did not have an impairment or combination of impairments that met

5

or medically equaled the criteria of the listings. (Tr. 27–28) The ALJ also concluded that V.M.D. did not have an impairment or combination of impairments that functionally equaled the listings. (Tr. 28–42.) Specifically, ALJ Xenos found that V.M.D. had less than marked limitation in four domains (acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being) and no limitation in two domains (moving about and manipulating objects and caring for himself). (*Id.*) The ALJ therefore concluded that V.M.D. was not disabled as defined by the Social Security Act from November 30, 2009, through the date of her decision. (Tr. 42.)

## III. THE ADMINISTRATIVE RECORD

### A. Testimony at the Hearing Before the ALJ

At the August 2011 hearing before the ALJ, when V.M.D. was five years old, Delarosa testified that V.M.D. would be starting kindergarten the following month. (Tr. 53.) He had been attending preschool four full days a week. (Tr. 53.) When questioned by V.M.D.'s attorney, Delarosa clarified that his preschool was for children with developmental problems. (Tr. 58.)

When asked by the ALJ why she thought her son was disabled or how he was different from other children, Delarosa said, "Because of his behavior, he does not understand me. . . . I talk to him and it's like I'm not talking to him, he still does things that he can get into an accident and he still does it." (Tr. 54.) She said V.M.D. would hit his two sisters "really hard" and was "constantly harassing them." (*Id.*)

When the ALJ asked whether V.M.D. got along with friends his age, Delarosa said older kids did not want to play with him because "they say that he is crazy," and although he liked to play with younger children he "hurts them . . . unintentionally." (Tr. 56.)  During questioning by V.M.D.'s attorney, Delarosa said V.M.D. was not "able to play safely" because, for example, "he's very rough. He tries to play but then he can get hurt or somebody can get hurt." (Tr. 59–60.) She also said that "when he is in groups with older children they all make fun of him. They say that he's not normal, that he's not right." (Tr. 60.)

When asked whether she was able to take V.M.D. out in public, Delarosa said she avoided it "because of his behavior" and she preferred to stay home because she was "afraid that he will cause an accident or that something might happen to him." (Tr. 60.) She said it was hard to control him around other people. (Tr. 61.)

Delarosa also testified that V.M.D. "has said that he wants to kill himself and he has tried to jump out of the window," and "[h]e hits himself and he scratches himself too." (Tr. 60.)

Delarosa said V.M.D. had been taking Lexapro daily for about a year and Risperidone daily for about four months, "so he can stay quiet." (*See* Tr. 55.) She said the medications were working to "keep him quiet." (Tr. 56.) When V.M.D.'s attorney asked whether counseling was helping Delarosa "deal with him," Delarosa said the counselor told her "it's going to take time like a year or two." (Tr. 60.)

According to Delarosa, V.M.D. generally slept from ten at night to eight in the morning (Tr. 56), but did not go to sleep at night until given medication (Tr. 59). She said he generally

watched television throughout the day, but "then at the same times he's jumping, doing things, busy." (Tr. 56–57.)

Delarosa testified that V.M.D. was born in the United States, and spoke both Spanish and English. (Tr. 57.) She said he was able to communicate his needs to her in "[s]ome things, some things not." (Tr. 60.)  For example, he will say he wants a hamburger when he actually wants something different to eat. (*See* Tr. 61.) She said he had an appointment coming up to address his speech problems. (*See id.*)

In response to questions from V.M.D.'s attorney, Delarosa testified that V.M.D. can feed himself but "he eats like a little child" and she "need[s] to be present because if the food is hot, he doesn't know the difference." (Tr. 58.) She said he was not able to dress and bathe himself; if told to do it himself, he will not do it. (*Id.*) She also said he was not able to control his bladder and bowels at night. (Tr. 59.)

Delarosa said V.M.D. "uses a little equipment or device all day long, in the morning and at night time" for his asthma." (Tr. 57.) His asthma is affected by his weight, and he is on a diet to prevent him from gaining more weight. (Tr. 57–58.) She also said he had worn glasses for about two years. (Tr. 58.)

**B. School Records**

A Detroit Public Schools ("DPS") teacher and an occupational therapist evaluated V.M.D. at his home on July 25, 2008, for the DPS Early Intervention Program. (Tr. 199–201, 215–17.) V.M.D. was then two years old. (*See* Tr. 199.) The teacher, Sarah DeSouza, completed

an "Educational Needs Assessment" to document her evaluation. (Tr. 199–201.) She concluded that V.M.D.'s "overall developmental functioning level falls within the range of 12–23 months based on the assessments administered." (Tr. 199.) She indicated the following areas needed to be addressed: cognition/language, fine motor, gross motor, and social/self-care. (Tr. 201.) The occupational therapist, Vicki Kienman, completed an "Occupational Therapy Assessment." (Tr. 215–17.) According to Kienman's testing, V.M.D.'s functioning ranged from 6–9 months (for language) to 18 months (for fine and gross motor skills). She identified two areas to be addressed—sensory awareness/comfort and self-care skills—and indicated that fine and gross motor skills were strengths for V.M.D. (Tr. 217.)

As part of the DPS Early Intervention evaluation, a school social worker, Diane Hurst, conducted a clinical interview with V.M.D.'s mother and a systematic behavioral observation of V.M.D. on September 22, 2008. (*See* Tr. 202, 214.) Her "Multidisciplinary Evaluation Report" concluded that V.M.D.'s "developmental delays have existed for more than sixty days, may adversely affect his education and appear in the affective domain." (Tr. 214.)

DPS's "Multidisciplinary Evaluation Team Summary" ("MET Summary"), dated September 22, 2008, referenced medical evaluations from September 17, 2008, and August 25, 2008, as well as the evaluations by the teacher, occupational therapist, and social worker. (Tr. 202–204.) According to the MET Summary, V.M.D. then exhibited "a ½–1 year delay in general development and a ½ year delay in motor development." (Tr. 202.) In particular, he had difficulty with "following verbal directions; using sounds or words to express needs [and]

9

feelings, identifying objects [and] pictures, imitating actions/words/written stories; sharing in play with peers without aggression; accepting limits without tantrums; balancing his body for slower, smoother movements." (Tr. 202.) The resulting "Individualized Education Program Team Report" ("IEP Team Report"), dated October 9, 2008, concluded that V.M.D. should receive special education interventions during Early Childhood Services. (Tr. 205–13.)

An occupational therapist, M. O'Connor, completed another occupational therapy assessment at V.M.D.'s home on September 15, 2009, when V.M.D. was three years old. (Tr. 218–20.) She did not recommend that V.M.D. continue with occupational therapy in preschool, stating that he had "made significant progress" and was "functioning within normal limits in gross and fine-motor development per this assessment and observation in Centerbase throughout last school year." (Tr. 220.) She also stated that V.M.D.'s hearing and vision were "within normal limits." (Tr. 219.)

DPS completed another IEP Team Report on November 17, 2009. (Tr. 221–32.) The report stated that V.M.D.'s fine and gross motor skills were then age-appropriate, but that he continued "to have difficulty with peer interactions such as turn taking and sharing," he needed "to accept behavioral limits and learn to express his feelings in an acceptable manner," and "to strengthen his perceptual discrimination skills and early communications skills." (Tr. 222.) These concerns were having "an adverse effect on [his] educational performance." (*Id.*) V.M.D. continued to be eligible for special education services in preschool. (Tr. 221.)

10

An IEP Progress Report completed by school social worker Diane Hurst on May 22, 2009, when V.M.D. was nearly four years old, stated that he had "shown limited progress." (Tr. 233.) He "continue[d] to engage in solitary play patterns," and did not "initiate interaction with others" or "accept reasonable behavioral limits on a consistent basis," but would "occasionally express his feelings appropriately." (*Id.*) School social work services were recommended due to his "[f]ailure to engage in socially appropriate interaction with others and inability to consistently accept reasonable behavioral limits." (*Id.*)

**C. Medical Records**

V.M.D.'s medical records include reports from the Neurology Clinic at the Children's Hospital of Michigan, documenting examinations on February 3, 2009, July 7, 2009, June 9, 2010, January 5, 2011, and March 23, 2011. (Tr. 187–88, 195–96, 276–77, 337–38, 348–50.) V.M.D. was first examined at the Children's Hospital Neurology Clinic on September 2, 2008, regarding fainting spells and a febrile seizure. (Tr. 195.) It appears that the fainting and seizures receded but the Clinic continued to treat V.M.D. for developmental delay, insomnia, and aggressive behavior. (*See* Tr. 187, 276, 337, 348–49.) Neurologist Dr. Huiyuan Jiang prescribed Clonidine for sleep and Risperdal for behavior. (Tr. 276–77, 337–38, 350.) He noted that EEGs[1] in 2008 and 2010 were normal and a VMR study[2] in 2010 was negative. (Tr. 349.) In January

---

[1] An EEG or electroencephalogram is a recording of the potentials on the skull generated by currents emanating spontaneously from nerve cells in the brain, used to diagnose certain neurologic conditions. *Dorland's Illustrated Medical Dictionary* (31st ed. 2007).

[2] A VMR or volumetric magnetic resonance imaging study uses three-dimensional rendering of images from an MRI for diagnosis of abnormalities. *See* Rusinek, H. et al., *Volumetric rendering of MR images*, 171 *Radiology* 269 (Apr. 1989).

2011, Dr. Jiang recommended that V.M.D. undergo "complete evaluation" at the Autism Center. (Tr. 350.)

According to a May 3, 2011 report from the Children's Hospital of Michigan Autism Center, V.M.D. was evaluated on March 2, 2011, and April 8, 2011 by the Autism Center psychologist, Michael Behen, Ph.D., and his staff. (Tr. 327.) The May 3 report was written on the occasion of a follow-up appointment with V.M.D's parents to review and discuss the evaluation. (Tr. 326–27.) According to the report, the March and April evaluations consisted of a diagnostic interview, direct testing and observations of V.M.D., and parent-reported developmental and behavioral rating scales and background information. (Tr. 327.) These evaluations indicated "significant deficits in social reciprocity" and "behavioral stereotypes" such as rocking and hand flapping. (*Id.*) According to the cognitive testing performed, V.M.D.'s "overall thinking and reasoning skills fell in the low range" and "[h]is level of adaptive functioning was measured in the Moderately Low range." (*Id.*) "Difficulties with manual dexterity" and "significant internalizing and externalizing behavioral problems" were also observed. (Tr. 327–28.) Based on the evaluations, V.M.D. was diagnosed with pervasive developmental disorder not otherwise specified and adjustment disorder with mixed disturbance of emotions and conduct. (Tr. 328.) Immediate educational, developmental, and behavioral interventions for Autism Spectrum Disorder were recommended. (Tr. 328–29.)

On May 24, 2011, V.M.D. was evaluated for treatment at Southwest Counseling Solutions. (Tr. 353–61.) Luis Flores, a limited license psychologist, diagnosed "Asperger's,

Pervasive develop[ment disorder] NOS, or Rett's disorder" and adjustment disorder with mixed disturbance of emotions and conduct, and assigned a GAF of 46.[3] (Tr. 361.) Flores recommended psychiatric evaluation (Tr. 59), which was performed on June 17, 2011, by psychiatrist Kyle Smith, D.O. (Tr. 362–365). Dr. Smith concluded:

> [H]e has got a Pervasive Developmental Disorder. It may emerge out as an Asperger's Syndrome but right now I think we are going to leave it as an Autistic Spectrum Disorder, NOS, but certainly he is very fluent with his language when he chooses and we will see how that plays out over time. He has a Disruptive Disorder, NOS. More of a symptom complex of the Asperger's or of the Autistic Spectrum Disorder, in terms of explosive anger directed at himself and others.

(Tr. 363.) He added: "academic testing would have him in the mental retarded range just because of his lack of engagement. It would not be a fair assessment at this point." (Tr. 364.) Dr. Smith assessed V.M.D.'s GAF score at "48 to 52 only because his level of protesting goes into very physical areas very quickly and we discussed with mom the difference between a temper tantrum and protesting behavior when it comes to autism." (*Id.*)

V.M.D.'s medical records also evidence treatment for asthma, obesity, gastroesophageal reflux disease, skin conditions, and allergies. (*See generally* Tr. 172–343.)

---

3 A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"),* 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF score of 41 to 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM–IV* at 34.

### D. SSA Consultants

Two medical consultants for Michigan's Disability Determination Services ("DDS"), a state agency that helps the Social Security Administration evaluate disability claimants in Michigan, signed a "Childhood Disability Evaluation Form" on May 27 and June 28, 2010: Claire Issa, M.D., a gynecologist, and Zahra Khademian, a psychiatrist. (Tr. 259.) *See* Program Operations Manual System § DI 26510.090(D), Description of Medical Specialty Codes, *available at* http://policy.ssa.gov/poms.nsf/lnx/0426510090 (last updated Aug. 29, 2012). Drs. Issa and Khademian concluded that V.M.D.'s impairments—which they identified as asthma, skin condition, ADHD, and borderline IQ, with potential at low average—separately or in combination, were severe, but did not meet, medically equal, or functionally equal the listings. (Tr. 262.) Their conclusion regarding functional equivalence was based on findings that V.M.D. had less than marked limitation in four domains (acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being) and no limitation in two domains (moving about and manipulating objects and caring for himself). (Tr. 260–61.)

On June 11, 2010, V.M.D. was evaluated by a licensed psychologist, Dr. Nick Boneff, at the request of DDS. (Tr. 265–72.) V.M.D. had just turned four years old. (Tr. 265.) Dr. Boneff conducted IQ testing and a mental status examination, obtained a history from V.M.D.'s parents via a translation service, and reviewed records. (Tr. 265.) On IQ testing, Dr. Boneff said V.M.D.'s "intellectual functioning was measured to vary, with IQ scores of verbal 74, in the

borderline range, performance 84, in the low average range, and full scale 75, also in the borderline range." (Tr. 268.) Dr. Boneff diagnosed ADHD, combined type, and borderline intellectual functioning, "with cognitive capacities probably in the low average range at least." (Tr. 269.) He assessed a Global Assessment of Functioning ("GAF") score of 50. (*Id.*) Dr. Boneff concluded: "Based on today's exam and testing, the claimant demonstrated cognitive strengths in nonverbal abstract thinking in particular . . . in the low average range in that ability with some measures in the average range." (*Id.*) The psychologist noted that V.M.D. "had more difficulty with verbal skills," but speculated that it might be "due in part to the parents' lack of facility with English." (*Id.*)

## IV. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence,

"it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## V. ANALYSIS

Delarosa argues that the Appeals Council should have remanded the case to the ALJ to consider new and material evidence that was not part of the record before the ALJ. (Pl. Mot. at 10–11.) Defendant points out that where the Appeals Council denies a claimant's request for

16

further administrative review, it is the ALJ's decision that is reviewed by the district court as the final decision of the Commissioner of Social Security, and evidence not before the ALJ may not be considered. (Def.'s Mot. at 12.) Defendant is correct. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."). But Delarosa also argues that the district court should remand so that the ALJ may consider the new and material evidence. (*See* Pl. Mot. at 25.)

Most social security cases are reviewed pursuant to sentence four of 42 U.S.C. § 405(g), which gives district courts "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." But sentence six of that statute provides further that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Under sentence six, evidence is not material unless there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with it. *Sizemore v. Sec'y of Health & Human Servs.*, 865 F. 2d 709, 711 (6th Cir.1988). Therefore, the evidence must not be cumulative of evidence already in the record. *See Ward v. Comm'r of Soc. Sec.*, 72 F.3d 131, at *3 (6th Cir. 1995) (unpublished).

Delarosa seeks a sentence six remand for the ALJ to consider (1) a "Confidential Autism Center Assessment Summary" regarding evaluations that took place on March 2, 2011, and April 8, 2011 (Tr. 159–65); and (2) a letter from Southwest Counseling Center dated October 4, 2012 (Tr. 158). (*See* Pl.'s Mot. at 10.)

The October 4, 2012 letter from Southwest Counseling is brief, indicating only that V.M.D. was receiving clinical and case management services weekly and psychiatric services monthly, was taking Clonidine to assist with sleep onset and duration, and was diagnosed with oppositional defiant disorder, disruptive behavior disorder not otherwise specified, and mental retardation, severity unspecified (rule out). (Tr. 158.) This diagnosis is different from the June 2011 diagnosis from Southwest Counseling that was in the record before the ALJ: pervasive developmental disorder and disruptive disorder, not otherwise specified. (Tr. 363.) The letter is therefore not cumulative of evidence already in the record. In addition, it establishes a longitudinal treatment record that could have caused the ALJ to give greater weight to the Southwest Counseling information than she did. The letter could be material. But Delarosa has not even attempted to establish good cause for her failure to obtain and submit the letter until after the ALJ hearing. Therefore, Delarosa has not met the standard for a sentence six remand as to this letter.

As to the "Confidential Autism Center Assessment Summary," on the other hand, there is good cause for the failure to incorporate it into the record before the ALJ. According to Delarosa, she submitted the Summary to DDS before the hearing, and it was the agency that

failed to put it in the record. (Pl.'s Reply at 3.) Furthermore, it appears that even in the memorandum to the Appeals Council, Delarosa's representative was under the mistaken impression that the Summary was part of the record. (*See* Tr. 155.)

The Confidential Autism Center Assessment Summary is also not cumulative. Although it contains virtually identical conclusions as a May 3, 2011 report from the Autism Center, which also summarized the March 2 and April 8 evaluations, and which was part of the record before the ALJ (Tr. 326–29), the "Assessment Summary" contains much more information to support those conclusions. It includes detailed results of IQ testing: V.M.D.'s verbal IQ was 81, performance IQ 88, and full scale IQ 85, which "indicates that his overall level of intellectual functioning falls in the mid point of the low average range, and is ranked at the 16th percentile." (Tr. 162.) It includes scores for an adaptive behavior scale that measures personal and social skills: V.M.D. had "an overall adaptive behavior composite of 71, which places current overall adaptive behavior functioning in the Moderately Low range," "Daily Living Skills sub domain . . . in the Low range, which indicates moderate to severe deficits in this area," and "Communication, and Socialization sub domains . . . in the Moderately Low range, which indicates mild to moderate deficits across these areas." (Tr. 163.) It includes the results of a Social Communication Questionnaire completed by V.M.D.'s parents, a "measure of the severity of autism spectrum symptoms as they occur in natural social settings," which "revealed severe elevations on all the subscales; social awareness, communication, social cognition, social

motivation, and autistic mannerisms," that were "above the clinical range and suggest[ed] the presence of a significant number of symptoms of an Autism Spectrum Disorder." (Tr. 163.)

But to be material, there must be a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the Confidential Autism Center Assessment Summary. To determine whether this evidence is material, the Court turns to how the ALJ made her decision.

The ALJ appears to have relied primarily on the findings of the DDS consultants to reach her conclusion that V.M.D. did not have an impairment or combination of impairments that functionally equaled the listings. (*See* Tr. 34–42.) For each domain, she stated that she "consider[ed] the claimant's testimony, the IEP, his Daily Activities, the Asthma Questionnaire, and medical evidence of record, and balance[ed] that information against the findings of the State agency," before adopting the state agency consultants' opinion regarding V.M.D.'s degree of limitation in that domain. (*See* Tr. 34, 36, 37, 39, 40, 42.) But the DDS consultants' opinions on V.M.D.'s limitations in the six domains were given in May and June 2010. (*See* Tr. 259.) Their review of V.M.D's records therefore did not include the results of the Autism Center evaluations, which took place in March and April 2011. (Tr. 327.) Nor did they consider the June 2011 psychiatric evaluation by Dr. Smith at Southwest Counseling Solutions. (*See* Tr. 362–365.) It appears that their conclusions regarding V.M.D.'s mental impairments were based primarily on the report of the DDS consultative examiner, Dr. Boneff. (*See* Tr. 264.)

20

The ALJ also seems to have given Dr. Boneff's opinion significant weight. She did not expressly assign a particular weight to his opinion, but repeatedly referenced his conclusions throughout her decision. (*See* Tr. 30–31, 34, 36, 37, 39, 40.)

On the other hand, the ALJ mentioned the May 3 Autism Center report just twice, each time merely noting the ultimate diagnosis. (*See* Tr. 32, 41.) The first mention is in the section addressing whether V.M.D.'s impairments functionally equal the severity of the listings, and the second is in the section addressing the sixth domain of functional equivalence, health and physical well-being. (*Id.*) Thus the ALJ seems not to have considered the Autism Center report's conclusions at all in reaching her conclusions about V.M.D's limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and self-care. (*See* Tr. 34–40.) In the first instance, the ALJ stated that V.M.D. "was evaluated for Autism Spectrum Disorder on May 3, 2011; however, he was diagnosed with Pervasive Development Disorder and an Adjustment Disorder (Exhibit 15F)." (Tr. 32.) This statement suggests that the ALJ misunderstood V.M.D.'s diagnosis, mistakenly believing that V.M.D. did not have an autism spectrum disorder. But pervasive development disorder was "the catch-all diagnosis" that included autistic disorder, Asperger's disorder, and childhood disintegrative disorder in the fourth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders. See* American Psychiatric Association, *A u t i s m   S p e c t r u m   D i s o r d e r   F a c t   S h e e t ,* http://www.dsm5.org/Documents/Autism%20Spectrum%20Disorder%20Fact%20Sheet.pdf (last

modified May 13, 2013). The new fifth edition of the manual replaces those four separate diagnoses with one diagnosis: autism spectrum disorder. *See id.* ("The Work Group believes a single umbrella disorder will improve the diagnosis of ASD without limiting the sensitivity of the criteria, or substantially changing the number of children being diagnosed.").

The Southwest Counseling information that was in the record was also mentioned only twice, in the same sections (*see* Tr. 32, 41), and thus apparently not considered by the ALJ to reach her conclusions about V.M.D's limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and self-care (*see* Tr. 34–40). The ALJ also seems not to have noticed that the June 2011 session at Southwest was a psychiatric evaluation by Dr. Smith, instead attributing it to the limited license psychologist, Flores, who performed the initial assessment in May. (*Compare* Tr. 41 *with* Tr. 353–61 *and* Tr. 362—365.) She states: "While the claimant's therapist originally diagnosed the claimant with Asperger's and a Pervasive Development Disorder with a GAF score of 46, Mr. Flores later changed his diagnosis to Autistic Disorder and Disruptive Behavior Disorder, not otherwise specified," and "also increased the claimant's GAF score to 48 from 46, indicating some improvement." (Tr. 41.)

In short, the ALJ gave much greater weight to the opinions of the DDS consultants than to those of the Autism Center and Southwest Counseling professionals in the record. Yet Dr. Boneff's diagnosis differs from theirs: Dr. Boneff diagnosed ADHD, combined type, and borderline intellectual functioning (Tr. 269), while they diagnosed pervasive developmental

disorder, adjustment disorder, and disruptive disorder (Tr. 328, 363). In fact, Dr. Boneff seems not to have evaluated whether V.M.D. had autism spectrum disorder or any behavior or emotional disorders; he stated that V.M.D. was referred for "IQ-Psychological Testing for mental retardation and Mental Status Exam regarding a claim of disability due to 'learning disability, speech and language delay, asthma, and skin allergies,'" and that the evaluation instruments he employed were "Mental Status Exam, with history provided by parents, and translation through translation service, WPPSI-III, review of records." (Tr. 265.) In contrast, Dr. Smith wrote that "academic testing would have [V.M.D.] in the mental retarded range just because of his lack of engagement" and "would not be a fair assessment at this point." (Tr. 364.) And Dr. Boneff's conclusion that V.M.D. "demonstrated cognitive strengths in nonverbal abstract thinking" and "would be expected to be able to have increasing capacity for success in school-type activities as he (and his parents) becomes more conversant in English," is at odds with the Autism Center conclusion that V.M.D.'s "overall thinking and reasoning skills fell in the low range" and that V.M.D. would require special education support in the classroom such as "assistance from a 1:1 paraprofessional." (Tr. 327–28.) Most glaringly, the Autism Center and Southwest Counseling evaluations indicated significant social and emotional issues, whereas Dr. Boneff merely noted that V.M.D. "is sometimes able to make and keep friends, but sometimes people do not understand him when he talks," "hits his sister sometimes," "will jump off of tables or run fast when he should not do these things," and "prefers to be by himself rather than with others per mom's report." (Tr. 267.)

So the ALJ gave significant weight to the opinion of a consultative examiner—both directly and by relying on the other DDS consultants who relied on Dr. Boneff—although his opinion differed from that of treating medical sources, without addressing those distinctions, and without giving any reasons for the weight assigned. This is reversible error.

The Sixth Circuit has emphasized that "an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source')." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). The opinion of a treating physician must be given controlling weight if it is well-supported and not inconsistent with the record, and even if it is not given controlling weight, it is subject to a rebuttable presumption of deference. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). To rebut the presumption, the ALJ must show that substantial evidence supports not deferring to the treating source. *See Rogers*, 486 F.3d at 246. This includes demonstrating that he considered the non-exhaustive list of factors in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). *See Rogers*, 486 F.3d at 242 ("When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."); *see also Wilson*, 378 F.3d at 544; Soc. Sec. Rul. 96-2p, 1996 WL 374188, at

24

*4. In fact, the requirement to provide "good reasons" for the weight assigned to a treating-source opinion is a substantial procedural right, abridgement of which warrants remand even when substantial evidence supports the ALJ's ultimate disability determination. *See Rogers*, 486 F.3d at 243. *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544. Indeed, an ALJ must always provide enough explanation for a reviewing court to understand how he or she reached the disability determination. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 518 (6th Cir. 2011) (reversing where the ALJ failed to discuss his reasons for rejecting an examining doctor's opinion in favor of a non-examining doctor's opinion on a key issue).

Thus, in the course of determining whether new and material evidence requires a sentence six remand, the Court has found that the ALJ's opinion was not supported by substantial evidence and a sentence four remand is required.

Turning back to the sentence six analysis, there is a reasonable probability that the ALJ would have reached a different disposition of the disability claim if presented with the Confidential Autism Center Assessment Summary. The ALJ may have better understood and given greater weight to the Autism Center Assessment if this more complete version of the report, with specific test results, had been included in the record. Accordingly, the case is also remanded pursuant to sentence six, and the ALJ should consider the Confidential Autism Center Assessment Summary on remand.

## VI. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court finds that the decision of the Administrative Law Judge is not supported by substantial evidence, and that new and material evidence requires remand. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 16) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 17) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VII. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and

a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


Date:   January 16, 2014                              s/Laurie J. Michelson
                                                      Laurie J. Michelson
                                                      United States Magistrate Judge



CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 16, 2014.

                                                      s/Jane Johnson_____
                                                      Deputy Clerk


27